1

2

3

4                    UNITED STATES DISTRICT COURT

5              FOR THE NORTHERN DISTRICT OF CALIFORNIA

6                          OAKLAND DIVISION

7

| | |
|---|---|
| KAYLEIGH SLUSHER, Deceased, THROUGH HER SUCCESSOR IN INTEREST JASON SLUSHER; JASON SLUSHER, Individually; ROBIN SLUSHER, Individually; and BENNY SLUSHER, Individually, | Case No:  C 15-2394 SBA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND ORDER OF REFERENCE FOR EARLY SETTLEMENT CONFERENCE** |
| Plaintiffs, | Dkt. 22, 23 |
| vs. | |
| CITY OF NAPA, a public entity; NAPA POLICE OFFICER GARRETT WADE, Individually; NAPA POLICE OFFICER DEGUILIO, Individually; NAPA CHIEF OF POLICE RICHARD MELTON, Individually and in his Official Capacity; COUNTY OF NAPA, a public entity; NAPA COUNTY CHILD WELFARE SERVICES SOCIAL WORKER NANCY LEFLER, Individually; NAPA COUNTY CHILD WELFARE SERVICES WORKER ROCIO DIAZ-LARA, Individually; and DOES 1-50, Jointly and Severally, | |
| Defendants. | |

22        On January 30, 2014, three year-old Kayleigh Slusher ("Kayleigh") was viciously

23  murdered by her mother, Sara Krueger ("Sara") and her mother's boyfriend, Ryan Warner

24  ("Ryan").[1]  Kayleigh's biological father, Jason Slusher ("Jason"), individually and on

25  behalf of Kaleigh, and Kayleigh's paternal grandparents, Robin Slusher ("Robin") and

26  Benny Slusher ("Benny"), in their individual capacities, bring the instant action against:

27  _____

28        [1] For clarity, Plaintiffs and related individuals will be referred to by their first names.

the City of Napa ("City"); the County of Napa ("County"); the Napa Police Department ("NPD") Chief Richard Melton; NPD officer Garrett Wade; NPD officer Dominic Deguilo; Child Welfare Services ("CWS") worker Rocio Diaz-Lara; and CWS worker Nancy Lefler-Panela. The operative pleading is the First Amended Complaint ("FAC"), which alleges federal claims pursuant to 42 U.S.C. § 1983 and <u>Monell v. Dep't of Soc. Serv. of N.Y.</u>, 436 U.S. 658 (1978), along with state law causes of action for violation of California's Bane Act and negligence/negligence per se.

The parties are presently before the Court on the City Defendants and the County Defendants' respective motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby GRANTS IN PART and DENIES IN PART both motions, with leave to amend. The Court, in its discretion, finds this matter suitable for resolution without oral argument. <u>See</u> Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.    BACKGROUND

### A.    FACTUAL SUMMARY

On May 3, 2010, Kaleigh was born to Sara and Jason. FAC ¶ 26. For over a year, Kaleigh and her mother lived with Jason's parents, Robin and Benny. <u>Id.</u> ¶ 27.[3] Sara eventually moved to her own apartment with Kayleigh. <u>Id.</u> Though no longer living with her grandparents, Kayleigh saw them regularly and often had weekend sleepovers at their home. <u>Id.</u> ¶ 29.

Around October 2013, Sara's boyfriend, Ryan, a "crank" (methamphetamine) addict with an outstanding arrest warrant, moved into Sara's apartment and began preventing the grandparents from seeing Kaleigh. <u>Id.</u> ¶¶ 30-31. The grandparents suspected that Sara and Ryan were engaging in illegal drug activity and placing Kayleigh at serious risk of harm.

---

[2] The City, Chief Melton and Officers Wade and Deguilo are referred to collectively as the "City Defendants," while the County and CWS workers Diaz-Lara and Lefler-Panela are collectively referred to as the "County Defendants."

[3] During this time, Jason was in prison for a crime unrelated to his relationship with Kaleigh. <u>Id.</u>

Id.  NPD police officers were summoned to Sara's apartment in October 2013 and January 2014 regarding disturbances there, but took no action.  Id. ¶ 32.

By January 2014, the grandparents had become increasingly concerned about Kayleigh, whom they had not seen or had contact with since Thanksgiving.  Id. ¶¶ 33, 50.  On January 23, 2014, Robin called the NPD to request a welfare check on Kayleigh.  Id. ¶ 33.  She expressed concern that Kayleigh was under the care of drug addicts, that Ryan had an outstanding warrant and was armed, and that Kayleigh was being mistreated and abused.  Id.  Officer Wade responded to the call, but concluded that the situation was unsafe for him and his partner.  Id.  He did not to call for back up or investigate the report of suspected child abuse and neglect, and simply cleared the call.  Id.[4]

Also on January 23, 2014, Robin made numerous attempts to contact CWS social workers Diaz-Lara and Lefler-Panela to report her concerns regarding Kayleigh's safety and well-being.  Id. ¶ 40.  Lefler-Panela later returned Robin's call, informing her that there was nothing CWS could do and to call the police instead.  Id. ¶ 41.

On January 29, 2014, at around 5:58 p.m., Robin, fearing that Kayleigh was in grave danger, again contacted NPD for assistance.  Id. ¶ 50.  At around 8:47 p.m., Officers Wade and Deguilio went to Sara's residence.  Id. ¶ 51.  Sara "actively tried to conceal the inside of her home from [them] by closing the front door against her body and peeking her head out to talk to them."  Id.  Sara brought Kayleigh to the front door.  Id.  The officers observed that Kayleigh had bruises on her face, appeared gaunt, sick, malnourished and distressed.  Id.  The officers also encountered Sara's boyfriend, Ryan, who falsely identified himself as "Ryan Howard."  Id.  Ryan appeared malnourished, with sunken cheekbones, and to be under the influence of narcotics.  Id.  After the officers entered the apartment, Kayleigh vomited in front of them, and was quickly taken to the bathroom by Sara.  Id.  They also saw a male whom they knew was on probation attempt to depart from

_____

[4] A few days later on the morning of January 27, 2014, unspecified NPD officers were again dispatched to Kaleigh's home due to a neighbor's report of a domestic disturbance.  Id. ¶ 38.  The officers never made any report of child abuse and/or neglect to CWS or any other authority.  Id. ¶ 38.

1  the premises.  Id.  Sara asked the officers to leave.  Id.  The officers complied, without

2  making any effort to speak with Kayleigh or physically examine her.  Id.

3      After the visit, Officers Wade and Deguillo determined that the person who

4  identified himself in the apartment as "Ryan Howard" had lied about his identity and, in

5  fact, was Ryan Warner.  Id. ¶ 51.  They also confirmed that Ryan had an active, outstanding

6  arrest warrant.  Id.  Despite this realization and their observations at the apartment, the

7  officers made no effort to obtain a warrant to re-enter the apartment or arrest him.  Instead,

8  Officer Wade called Robin and told her that Kayleigh had food and that everything

9  appeared normal at the home.  Id.  Defendant Wade also reassured Robin that he would

10 "keep an eye on the apartment."  Id. ¶ 55.  Had Defendants investigated further, they would

11 have discovered that Ryan had an extensive criminal history, which included, without

12 limitation, assault and possession of drugs.  Id. ¶ 52.  Ryan also had a restraining order

13 entered against him for threatening to kill his pregnant ex-girlfriend, among making other

14 extremely sadistic and violent threats.  Id. ¶ 56.

15     On or about February 1, 2014, NPD police officers responded to a call to perform

16 another welfare check on Kayleigh.  Id. ¶ 57.  When the officers arrived at Sara's

17 apartment, they discovered Kaleigh lying deceased in her bed, with evidence of having

18 suffered severe physical abuse.  Id.  The Napa County District Attorney later reported that

19 Kaleigh died from multiple blunt force trauma with impact injuries to her head, torso and

20 extremities.  Id. ¶ 57.  Sara and Ryan have been charged with Kaleigh's murder.  Id.

21     **B.  PROCEDURAL HISTORY**

22     On May 29, 2015, Plaintiffs filed the instant action in this Court and subsequently

23 filed a FAC on July 1, 2015.  The FAC alleges the following claims:  (1) violation of due

24 process, mandatory reporting requirements, and interference with familial relations,

25 pursuant to 42 U.S.C. § 1983; (2) Monell liability; (3) violation of the Bane Act, Cal. Civ.

26 Code § 52.1; and (4) negligence/negligence per se.  The County Defendants and City

27 Defendants have separately filed motions to dismiss all claims alleged in the FAC.  The

28 motions are fully briefed and ripe for adjudication.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires not only 'fair notice of the nature of the claim, but also grounds on which the claim rests.'" Zixiang Li v. Kerry, 710 F.3d 995, 998-99 (9th Cir. 2013) (quoting in part Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 n.3 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570 (2007)).

In assessing the sufficiency of the pleadings, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). Where a complaint or claim is dismissed, leave to amend generally is granted, unless further amendment would be futile. Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1041 (9th Cir. 2011).

## III.   **DISCUSSION**

### A.   **42 U.S.C. § 1983**

Plaintiffs' first claim for relief under § 1983 for denial of due process and interference with familial relations is directed against Officers Wade and Deguilo and CWS workers Diaz-Lara and Lefler Panela. Section 1983 provides that individuals may sue government officials who violate their civil rights while acting "under color of any statute,

ordinance, regulation, custom, or usage, of any State."  42 U.S.C. § 1983.  To maintain a claim pursuant to § 1983, a plaintiff must establish:  (1) the deprivation of any rights, privileges or immunities secured by the Constitution or federal law, (2) by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009).  In addition, defendant's actions must both actually and proximately cause the deprivation of a federally protected right.  Lemire v. Caifornia Dep't of Corrections & Rehabilitation, 726 F.3d 1062, 1074 (9th Cir. 2013).  Section 1983 is not itself a source of substantive rights, but a jurisdictional vehicle for vindicating federal rights elsewhere conferred.  See Thornton v. City of St. Helens, 425 F.3d 1158, 1164 (9th Cir. 2008) (citations omitted).

### 1.    Due Process

"The Fourteenth Amendment prohibits states from 'depriv[ing] any person of life, liberty, or property, without due process of law.'"  Newman v. Sathyavaglswaran, 287 F.3d 786, 789 (9th Cir. 2002) (quoting U.S. Const. amend. XIV, § 1).  The Due Process Clause encompasses two types of protections:  procedural fairness (procedural due process) and substantive rights (substantive due process).  Zinermon v. Burch, 494 U.S. 113, 125-28 (1990).  A procedural due process claim challenges the procedures used in effecting a deprivation, whereas a substantive due process claim challenges the governmental action itself.  See Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006).

Here, the gist of Plaintiffs' due process claim is that Defendants violated their mandatory duties to investigate and report child abuse, which, in turn, led to Kayleigh's murder.  FAC ¶¶ 64-66.  Although the pleadings do not specify whether the due process claim is based on substantive or procedural due process, Plaintiffs state in their opposition that they are proceeding on both legal theories.

### a)    Substantive Due Process

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989) (holding that a social services agency and

social workers did not violate a child victim's substantive due process rights by failing to protect him from his abusive father, notwithstanding significant evidence establishing that the child was subjected to beatings).  "There are two exceptions to this rule:  (1) when a 'special relationship' exists between the plaintiff and the state (the special-relationship exception) . . . ; and (2) when the state affirmatively places the plaintiff in danger by acting with 'deliberate  indifference' to a 'known or obvious danger' (the state-created danger exception) . . . ."  Patel v. Kent School Dist., 648 F.3d 965, 971-72 (9th Cir. 2011) (citations omitted).  Plaintiffs rely on the state-created danger exception, sometimes simply referred to as the "danger creation" exception.  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006) (citing DeShaney, 489 U.S. at 197).

"[A] police officer's conduct that affirmatively places a plaintiff in a position of danger deprives him or her of a substantive due process right."  Johnson v. City of Seattle, 474 F.3d 634, 639 (9th Cir. 2007) (citing Wood v. Ostrander, 879 F.2d 583, 589-90 (9th Cir. 1989)).  "To determine whether an official affirmatively placed an individual in danger, we ask: (1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger."  Henry A. v. Willden, 678 F.3d 991, 1002 (9th Cir. 2012).

For example, in Wood, a trooper stopped a car in which the plaintiff was a passenger, arrested the driver for drunk driving, and left the plaintiff in a high crime area at 2:30 a.m.  The plaintiff later accepted a ride from a stranger and was raped.  The Ninth Circuit reversed a summary judgment ruling in favor of the trooper, finding that there was "a factual dispute regarding whether [the trooper] deprived her of a liberty interest protected by the Constitution by affirmatively placing her in danger and then abandoning her."  Id. at 596.  Similarly, in Maxwell v. County of San Diego, 708 F.3d 1075 (9th Cir. 2013), the court found that the police officers affirmatively increased the danger to an individual who had been shot and later died by preventing her ambulance from leaving the scene.  Id. at 1082.  The court explained that the delay left the victim "worse off than if the

1    ambulance had been allowed to bring her to an air ambulance that had advanced medical

2    capabilities and was ready to fly her to a trauma center." Id.

3         Plaintiffs argue that the Ninth Circuit's decision in Kennedy, in particular, supports

4    the application of the danger creation exception. In Kennedy, the plaintiff, the mother of a

5    nine year-old girl, reported to the police that a thirteen year-old neighbor had molested her

6    daughter. In response to the mother's concern regarding the neighbor's history of violence,

7    the officer told her that she would be given notice prior to any police contact with the

8    neighbor's family regarding her allegations. Kennedy, 439 F.2d at 1058. Despite those

9    assurances, the police officer, without first notifying the mother, informed the neighbor and

10   his mother of the plaintiff's claim of molestation. When the plaintiff learned of this, she

11   asked the officer why he had contacted the neighbor without first notifying her, and

12   expressed serious concerns for her safety. In response, the officer "assured [the plaintiff]

13   that the police would patrol the area around both her house and the [neighbor's] house that

14   night to keep an eye on [him]." Id. Due to the late hour and the officer's promise to patrol

15   the neighborhood, the plaintiff and her husband decided to stay at their house. Id. The

16   following morning, the neighbor broke into the plaintiff's home and shot her and her

17   husband, killing him, as they slept. Id. In upholding the denial of qualified immunity for

18   the officer, the Ninth Circuit held that the officer "affirmatively created a danger to [the

19   plaintiff] she otherwise would not have faced, i.e., that [the neighbor] would be notified of

20   the allegations before the [parents] had the opportunity to protect themselves from his

21   violent response to the news." Id.

22        Plaintiffs contend that Defendants' failure to investigate and report on the suspected

23   abuse of Kayleigh, in tandem with Officer Wade's "false" assurance that "everything

24   appeared normal" at Kayleigh's home and that he would "keep an eye on the apartment,

25   affirmatively increased the risk of harm to Kayleigh. Pls.' Opp'n at City Defs.' Mot. to

26   Dismiss at 9-10. The Court disagrees. In Kennedy, the affirmative danger created by the

27   officer was his informing the neighbor of the plaintiff's accusations before she and her

28   husband could protect themselves against the neighbor's violent response—coupled with

his assurance to monitor the defendant.  439 F.3d at 1058.  Here, the risk to Kayleigh was the fact that she lived with adults who were abusive.  While Defendants were allegedly derelict in their failure to extricate Kayleigh from that situation, no facts are alleged that suggest that they placed her in danger or *affirmatively increased* the risk of harm to her through their inaction.  Despite Plaintiffs' intimations to the contrary, <u>Kennedy</u> does not support the proposition that false assurances by a law enforcement officer, standing alone, can affirmatively create a danger.  439 F.3d at 1063.  To the contrary, the court simply explained that such misrepresentations can constitute "an additional and aggravating factor, making [the plaintiff] more vulnerable to the danger he had already created."  <u>Id.</u>

Construing the facts in a light most favorable to Plaintiffs, the pleadings, at most, demonstrate that Defendants knew or had reason to know that Kayleigh was at serious risk of harm.  Absent from the pleadings are any facts demonstrating that Defendants affirmatively placed Kayleigh in a position that increased such risk.  <u>See</u> <u>DeShaney</u>, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").  As such, the Court finds that Plaintiff has failed to state a claim based on the denial of the right to substantive due process.  The foregoing notwithstanding, it is possible that Plaintiffs will be able to rectify these deficiencies through the presentation of additional facts.  Accordingly, Plaintiffs are granted leave to amend their substantive due process claim.

### b)   *Procedural Due Process*

The procedural due process component of the Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process.  <u>Portman v. Cnty. of Santa Clara</u>, 995 F.2d 898, 904 (9th Cir. 1993).  "State law can create a right that the Due Process Clause will protect only if the state law contains '(1) substantive predicates governing official decisionmaking, and (2) explicitly mandatory language specifying the outcome that must be reached if the substantive predicates have

1   been met.'"  James v. Rowlands, 606 F.3d 646, 656 (9th Cir. 2010) (quoting Bonin v.

2   Calderon, 59 F.3d 815, 842 (9th Cir. 1995)).

3          According to the FAC, Plaintiffs' protected property interest arises principally from

4   the mandatory child abuse reporting requirements set forth in the California Child Abuse

5   and Neglect Reporting Act ("CANRA"), Cal. Pen. Code §§ 11164-11174.4.  FAC ¶ 64.

6   Among other things, CANRA provides that specified "mandated reporters," which include

7   social workers and police officers, "*shall* make a report to an agency specified in Section

8   11165.9 whenever the mandated reporter, in his or her professional capacity or within the

9   scope of his or her employment, has knowledge of or observes a child whom the mandated

10  reporter knows or reasonably suspects has been the victim of child abuse or neglect."  Cal.

11  Pen. Code § 11166(a) (emphasis added); see also id. § 11165.7(a) (list of "mandated

12  reporters").  California courts have construed this provision as imposing "two mandatory

13  duties" on a mandated reporter who receives an account of child abuse:  (1) the duty to

14  investigate; and (2) the duty to file a report of child abuse when an objectively reasonable

15  person in the same situation would suspect abuse.  Alejo v. City of Alhambra, 75

16  Cal.App.4th 1180, 1186 (1999).[5]  A violation of section 11166's duties constitutes a

17  misdemeanor offense.  Cal. Pen. Code § 11166(c).

18         The County Defendants contend that CANRA only creates a discretionary as

19  opposed to a mandatory duty and therefore fails to provide any "substantive predicates to

20  decision-making."  County Defs.' Mot. to Dismiss at 6.  They posit that since the reporting

21  obligation is triggered only upon a "reasonable suspicion" of child abuse, a mandated

22  reporter inherently must use discretion in determining whether to make a report of

23  suspected child abuse in the first instance.  Id.  These contentions are uncompelling.  The

24  plain language of the statute clearly states that a "*mandated* reporter *shall* make a report" to

25  CPS, police, or other law enforcement agency upon a reasonable suspicion of child abuse or

26

27         [5] The Alejo court noted that while the duty to investigate is not express, it is clearly
       envisioned by the statute so the officer can determine whether there is a reasonable
28     suspicion of child abuse. 75 Cal.App.4th at 1186.

neglect.  Cal. Pen. Code § 11166(a) (emphasis added).  As noted, California courts have construed this obligation as a "mandatory" one.  <u>Alejo</u>, 75 Cal.App.4th at 1185-86; <u>see also</u> <u>Tarrant Bell Property, LLC v. Superior Court</u>, 51 Cal.4th 538, 542 (2011) (noting that the Legislature's use of the word "shall" denotes a mandatory act).  Defendants' assertion that no mandatory duty is imposed under CANRA also is undermined by the fact that the statute explicitly requires that a mandated reporter apply an *objective* standard in determining whether there is reasonable suspicion a child has been abused or neglected.  Cal. Pen. Code § 11166(a)(1); <u>see</u> <u>Olim v. Wakinekona</u>, 461 U.S. 238, 249 (1983) ("If the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected liberty interest.") (citations omitted).

Having concluded above that CANRA provides "substantive predicates" to guide the decisionmaker, the question becomes whether it also contains "'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow . . . ."  <u>Kentucky Dept. of Corrections v. Thompson</u>, 490 U.S. 454, 463 (1989).  In <u>Thompson</u>, the Supreme Court considered whether prison regulations governing visitation could give rise to a protected liberty interest.  The Court found that while the regulations "do provide certain 'substantive predicates' to guide the decisionmaker," they "lack the requisite relevant mandatory language" because "[t]hey stop short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met."  <u>Id.</u> at 463-64.  In particular, the procedures at issue granted administrative staff discretion whether to allow or disallow visits, such that the "overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions."  <u>Id.</u>

The County Defendants assert that CANRA and the other statutes and regulations cited by Plaintiffs contain no mandatory language specifying the particular outcome that must be reached if the substantive predicates have been met.  More specifically, they assert

that "the statutes [cited by Plaintiffs] articulate the procedure for evaluation, reporting and investigation; [however,] the substantive outcome as the report of Robin Slusher or other report is left open to the discretionary decisions of CWS personnel." County Defs.' Mot. to Dismiss at 6-7. For their part, Plaintiffs do not respond to Defendants' argument or otherwise address that contention. As for the pleadings, they do not allege that any of the cited authority mandates a particular outcome—or what that outcome would be. See FAC ¶ 64. In the absence of such allegations, coupled with Plaintiffs failure to address this issue in their opposition, the Court cannot conclude at this juncture that Plaintiffs have alleged a plausible claim for procedural due process. Since Plaintiffs may be able to rectify this deficiency, the Court dismisses this claim with leave to amend.

### 2.    Familial Association

The Fourteenth Amendment protects the liberty interest in familial companionship and association against unwarranted governmental interference. See Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010); Crowe v. Cnty. of San Diego, 608 F.3d 406, 441 & n. 23 (9th Cir. 2010). The liberty interest in familial companionship encompasses the familial relationship between parents and children. Curnow By and Through Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991). "Moreover, the First Amendment protects those relationships, including family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001).

Defendants contend that Plaintiffs' familial association claim must be dismissed because the pleadings fail to demonstrate an underlying constitutional violation. Though it has not addressed this issue directly, the Ninth Circuit has intimated that an underlying due process violation is a prerequisite to a claim for denial of familial association claim based on the Fourteenth Amendment. See, e.g., Lee, 250 F.3d at 685 ("[T]he state's interference with [the right of familial association] *without due process of law* is remediable under 42

1  U.S.C. § 1983.") (internal quotations omitted, emphasis added); accord McClurg v.

2  Maricopa Cnty., No. CIV-09-1684-PHX-MHB, 2012 WL 3655318, at *9 (D. Ariz. Aug.

3  27, 2012) ("[T]he right to familial association can only be violated if there is an underlying

4  due process violation.").

5      Plaintiffs fail to respond directly to Defendants' argument, and instead points out

6  that in Lee the Ninth Circuit recognized that a familial association claim may also be

7  predicated on the First Amendment.  Neither of the moving or reply memoranda filed by

8  either set of Defendants addresses Plaintiffs' familial association claim in that context.  The

9  Court notes that there appears to be no controlling case law regarding the legal standard for

10 stating a familial association claim under the First Amendment.  See Schwartz v. Lassen

11 Cnty., No. 2:10-CV-03048-MCE), 2013 WL 5375588, at *10 (E.D. Cal., Sept. 24, 2013)

12 ("[T]he contours of a First Amendment familial association claim are unclear, and indeed

13 the Court is aware of no Ninth Circuit case setting out specifically the conduct or elements

14 that constitute violation of familial association under the First Amendment.").  Given the

15 paucity of authority, along with Defendants' failure to meaningfully address this issue, the

16 Court declines to dismiss Plaintiff's familial association claim insofar as it is predicated on

17 the First Amendment.  See Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir.

18 2003) ("It is [the movant's] burden . . . to present the court with legal arguments to support

19 its claims.").[6]

20                    **3.   Monell Liability**

21      Plaintiffs' second claim for municipal and supervisorial liability is alleged against

22 the County, the City and Chief Melton.  "In order to establish liability for governmental

23 entities under Monell, a plaintiff must prove '(1) that [the plaintiff] possessed a

24 constitutional right of which [s]he was deprived; (2) that the municipality had a policy;

25 (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right;

26

27      [6] In view of the Court's ruling on Plaintiffs' due process claims, Plaintiffs ability to
        proceed on a familial association claim based on the Fourteenth Amendment is dependent
        upon their ability to rectify the deficiencies discussed above in connection with those
28      claims.

and, (4) that the policy is the moving force behind the constitutional violation.'"  Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original).

A Monell claim may take one of three forms:  (1) "when implementation of its official policies or established customs inflicts the constitutional injury"; (2) when omissions or failures to act amount to a local government policy of "deliberate indifference" to constitutional rights[7]; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct.  Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010).  To state a claim, the pleadings need only "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  AE ex rel. Hernandez v. Cnty. of Tulare, 666 F.3d 631, 637 (9th Cir. 2012) (addressing the pleading requirements applicable to a Monell claim).  In addition, the facts alleged must "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Id.  Here, Plaintiffs seek to state a claim under each of three aforementioned theories of liability; to wit, the existence of a policy or custom, ratification and failure to train.

### a)    Policy or Custom

Defendants first contend that Plaintiffs' allegations regarding the existence of a policy or custom are too vague and non-specific to state a claim.  The Court partially agrees with Defendants' assertion.  Although the pleadings specifically identify the various policies or customs allegedly implicated in the constitutional injury alleged suffered by Plaintiffs,  see FAC ¶ 70(a)-(f), they fail to distinguish between the acts or omissions of the County, City and Chief Melton.  Instead, Plaintiffs inappropriately allege a variety of policies which they attribute generally to these Defendants.  See Connick v. Thompson, – U.S. –, –, 131 S.Ct. 1350, 1359 (2011) ("[U]nder § 1983, local governments are responsible

---

[7] An actionable policy can "be one of action or inaction."  Waggy v. Spokane County Wash., 594 F.3d 707, 713 (9th Cir. 2010) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989) (internal quotations omitted).  "[A] municipality's failure to train its employees is one such claim of omission or inaction by the municipality."  Id.

only for 'their own illegal acts.").  Because the pleadings fail to give each of the Defendants particular fair notice of the particular policies attributed to them, Plaintiffs' policy and custom claim is dismissed with leave to amend.[8]

### b)    Ratification

"A municipality . . . can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions."  Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999); see also Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (noting than an "official with final policy-making authority" may be liable for ratifying a subordinate's unconstitutional conduct).  "To show ratification, a plaintiff must show that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"  Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004) (citation omitted).  The plaintiff must establish that the ratification was a "conscious, affirmative choice."  Clouthier, 591 F.3d at 1250.  A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim.  Lytle, 382 F.3d at 987.

The FAC alleges that the County, City and Chief Melton "approved, tolerated and/or ratified" the acts and omissions of officers with the NPD and CWS, notwithstanding their "direct knowledge of the facts of this incident."  FAC ¶ 72.  However, no facts are alleged to support this conclusory assertion.  There are no allegations specifying the particular actions at issue or how and by whom they were ratified.  Since it is possible that these deficiencies can be cured with additional factual allegations, the Court dismisses the claim with leave to amend.

### c)    Failure to Train

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with

---

[8] The City Defendants contend Plaintiffs' Monell claim must be dismissed based on their failure to allege an underlying constitutional violation.  It is true that there can be no Monell liability without an underlying constitutional violation.  Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994).  Accordingly, Plaintiffs' ability to proceed on a Monell claim based on an underlying due process violation is contingent on whether they are able to state a plausible due process violation.

whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). To state a claim for insufficient training, plaintiff must allege facts sufficient to show that the County, City and Chief Melton "disregarded the known or obvious consequence that a particular omission in their training program would cause [the individual defendants] to violate citizens' constitutional rights." Flores v. Cnty. of Los Angeles, 758 F.3d 1154, 1159 (9th Cir. 2014).

With respect to the failure to train, the pleadings allege that the City, County and Chief Melton "failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described above." FAC ¶ 71. This conclusory allegation, without more, is insufficient to state a claim for failure to train. See Flores, 758 F.3d at 1159. Plaintiffs' failure to train claim is dismissed with leave to amend.

### d)    Chief Melton

Chief Melton is named as a party-defendant in both his official and individual capacities. Official capacity claims against an individual are the functional equivalent of a suit against the entity of which he is an agent. Kentucky v. Graham, 473 U.S. 159 (1985). Since Chief Melton is alleged to be an agent of the City, the official capacity claims alleged against him are dismissed as duplicative. See Center for Bio-Ethical Reform, Inc. v. Los Angeles Cnty Sheriff Dept., 533 F.3d 780, 799 (9th Cir. 2008) (holding that a county sheriff sued in "official capacity" is a redundant defendant and should be dismissed when the county is also named).

To state an individual capacity claim against Chief Melton, Plaintiffs must allege facts showing that he "was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." Edgerly v. City and Cnty. of San Francisco, 599 F.3d 946, 961 (9th Cir. 2010); e.g., Hydrick v. Hunter, 669 F.3d 937, 941-42 (9th Cir. 2012) (noting that to state an individual capacity claim, the complaint must identify the specific conduct that forms the basis of the claim against the individual defendant). Because such facts are not

1  pled, the individual capacity claims against Chief Melton are dismissed with leave to

2  amend.

### 4.   Qualified Immunity

4       Defendants contend, in the alternative, that they are entitled to qualified immunity

5  with respect to Plaintiffs' federal claims.  "The doctrine of qualified immunity protects

6  government officials 'from liability for civil damages insofar as their conduct does not

7  violate clearly established statutory or constitutional rights of which a reasonable person

8  would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v.

9  Fitzgerald, 457 U.S. 800, 818 (1982)).  When presented with a qualified immunity defense,

10  the court considers: (1) whether the facts alleged, taken in the light most favorable to the

11  plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional

12  right; and (2) whether the right at issue was "clearly established."  Saucier v. Katz, 533

13  U.S. 194, 201 (2001).

14       In view of the dismissal of Plaintiffs' due process claims with leave to amend, it is

15  unnecessary at this juncture to determine whether those claims are precluded by the

16  doctrine of qualified immunity.  As for Plaintiffs' remaining First Amendment-based

17  familial association claim, Defendants fail to discuss that claim specifically.  Accordingly,

18  the Defendants' motion to dismiss based on qualified immunity is denied at this time.

### B.   STATE LAW CLAMS

### 1.   Bane Act

21       Jason, as Kayleigh's successor-in-interest, asserts a survival claim under California's

22  Bane Act, which provides that a person "whose exercise or enjoyment" of constitutional

23  rights has been interfered with "by threats, intimidation, or coercion" may bring a civil

24  action for damages and injunctive relief.  Cal. Civ. Code § 52.1. "The essence of a Bane

25  Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation

26  or coercion'), tried to or did prevent the plaintiff from doing something he or she had the

27  right to do under the law or to force the plaintiff to do something that he or she was not

28

1   required to do under the law." <u>Austin B. v. Escondido Union Sch. Dist.</u>, 149 Cal.App. 4th

2   860, 883 (2007) (citing <u>Jones v. Kmart Corp.</u>, 17 Cal.4th 329, 334 (1998)).

3        Defendants argue that Plaintiff's Bane Act claim should be dismissed because such a

4   claim is personal to the victim and does not survive her death.[9]  As support, Defendants cite

5   <u>Bay Area Rapid Transit Dist. v. Superior Court</u>, 38 Cal.App.4th 141 (1995), which held

6   that the parents of a child victim could not bring a wrongful death claim under the Bane Act

7   because the statute only provides for "a *personal* cause of action for the victim[.]"  <u>Id.</u> at

8   144.  Notably, the court did not address or preclude a survival claim.  Here, Jason does not

9   allege a Bane Act claim for injuries *he* sustained.  Rather, Jason seeks to vindicate rights

10  personal to Kayleigh in the form of a survival claim under California Code of Civil

11  Procedure § 377.20.  Courts within this District have concluded that such a claim is

12  permissible.  <u>See M.H. v. Cnty. of Alameda</u>, 62 F.Supp.3d 1049, 1096 (N.D. Cal. 2014)

13  ("A survival Bane Act claim, unlike a wrongful death Bane Act claim, is permissible.");

14  <u>accord</u> <u>Medrano v. Kern Cnty. Sheriff's Officer</u>, 921 F.Supp.2d 1009, 1016 (E.D. Cal.

15  2013); <u>Dela Torre v. City of Salinas</u>, No. 09-cv-00626-RMW, 2010 WL 3743762, at *7

16  (N.D. Cal. Sept. 17, 2010).[10]  The Court therefore rejects Defendants' contention that Jason

17  lacks standing to bring a Bane Act claim.

18       The above notwithstanding, the FAC fails to allege a plausible survival claim under

19  the Bane Act.  To prevail on a Bane Act claim, a plaintiff must demonstrate, inter alia,

20  "intimidation, threats or coercion."  <u>Jones v. Kmart Corp.</u>, 17 Cal.4th 329, 334 (1998).  The

21  ───────────────

22      [9] A survival action is a personal injury action that survives to permit a decedent's
    estate to recover damages that would have been personally awarded to the decedent had he

23  survived.  Cal. Civ. Pro.Code §§ 377.20, 377.30.  In contrast, a wrongful death action is an
    independent claim for damages personally suffered by a decedent's heirs as a result of the

24  decedent's death.  <u>Id.</u> § 377.60; <u>see</u> <u>Davis v. Bender Shipbuilding & Repair Co.</u>, 27 F.3d
    426, 429 (9th Cir. 1994).

25      [10] Defendants cite <u>Tolosko-Parker v. County of Sonoma</u>, No. C 06-06841 CRB,
    2009 WL 498099, at *5 (N.D. Cal., Feb. 26, 2009) which concluded that the parents of the

26  decedent could not bring a survival claim under the Bane Act.  The court's opinion offers
    no reasoning or analysis to support that conclusion, and merely cites <u>Bay Area Rapid</u>

27  <u>Transit District</u>, which, as discussed, does not stand for that proposition a survival claim
    cannot be brought under the Bane Act.  The Court therefore finds <u>Tolosko-Parker</u> to be

28  unpersuasive and declines to follow it.

1    FAC fails to allege such facts.  Accordingly, Plaintiffs' third claim for relief is dismissed

2    with leave to amend.

3                        **2.       Negligence/Negligence Per Se**

4           Plaintiffs' fourth and final claim for relief for negligence/negligence per se is

5    brought against all Defendants.  "To state a cause of action under the negligence per se

6    doctrine, the plaintiff must plead four elements: (1) the defendant violated a statute or

7    regulation, (2) the violation caused the plaintiff's injury, (3) the injury resulted from the

8    kind of occurrence the statute or regulation was designed to prevent, and (4) the plaintiff

9    was a member of the class of persons the statute or regulation was intended to protect."

10   <u>Alejo</u>, 75 Cal.App.4th at 1184-85 (citing Cal. Evid. Code § 669); <u>see</u> <u>Transamerica Title</u>

11   <u>Ins. Co. v. Green</u>, 11 Cal.App.3d 693, 702 (1970) ("The breach of statutory duty is

12   negligence per se").  At issue here are the duty and causation elements.

13          Defendants contend that CANRA and the other statutes and regulations alleged in

14   the FAC impose no mandatory duties on them, and by extension, cannot form the basis for

15   a negligence per se claim.  Defendants further argue that, pursuant to California

16   Government Code §§ 815.2 and 820.2, they are entitled to statutory immunity for

17   discretionary acts.[11]  The California Court of Appeal in <u>Alejo</u> rejected virtually identical

18   arguments.  In that case, the father of three year-old Alec Alejo ("Alec") had received

19   reports from the mother's friend and neighbor that the mother's boyfriend was using drugs

20   and physically abusing Alec.  <u>Alejo</u>, 75 Cal.App.4th at 1183.  The father reported the abuse

21   to the local police department, which failed to conduct any investigation into Alec's well-

22   being.  <u>Id.</u>  Six weeks later, the mother's boyfriend savagely beat Alec, causing him to

23   suffer total and permanent disability.  <u>Id.</u>  The father, on behalf of Alec, filed suit against

24

25

26          [11] Government Code § 820.2 provides that "a public employee is not liable for an
     injury resulting from his act or omission where the act or omission was the result of the
27   exercise of the discretion vested in him, whether or not such discretion be abused."  Section
     815.2 provides generally that a public entity is not liable for an injury resulting from an act
28   or omission of its employee if the employee himself is immune from liability.

1  the city and two police officers alleging that they were negligent in failing to investigate or

2  report a reasonable suspicion of child abuse as mandated by CANRA.  Id. at 1183-84.

3  The trial court sustained the city's demurrer on the grounds that its police

4  department and officers had no special duty to protect a child from abuse, were immune

5  from liability for discretionary conduct, and, in any event, their failure to act was not the

6  cause of Alec's injuries.  Id. at 1184.  The California Court of Appeal reversed, holding

7  "the duty to investigate and report child abuse is *mandatory* under [CANRA]."  Id. at 1186.

8  In addition, the court found that "[the officers'] failure to investigate was clearly a breach

9  of [that] duty," and therefore, the plaintiff could state a cause of action for negligence per se

10 against the police officers.  Id. at 1189.  The court likewise rejected the city's claim of

11 statutory immunity, concluding the immunity statutes do not bar liability for breach of a

12 *mandatory* law enforcement duty.  Id. at 1194.  With regard to the issue of causation, the

13 court concluded that the question of whether the defendants' alleged violation of their

14 mandatory duty to investigate and report child abuse resulted in harm could not be decided

15 at the pleading stage.  Id. at 1190-91.

16 Despite the fact Alejo is directly on point and discussed extensively in Plaintiffs'

17 opposition briefs, Defendants offer no argument in rebuttal.  Instead, they contend that this

18 case is controlled by Jacqueline T. v. Alameda County Child Protective Services, 155

19 Cal.App.4th 456 (2007), where the court rejected negligence and negligence per se claims

20 brought against a county and two of its social workers who allegedly failed to adequately

21 investigate reports of sexual abuse against several minors.  In that case, the plaintiff alleged

22 that the defendants "breached this mandatory duty [i.e., CANRA], not by failing to

23 investigate the alleged abuse, but rather by failing to 'reasonably and diligently' investigate

24 it."  Id. at 470.  In the instant case, however, Plaintiffs allege that the individual Defendants

25 "failed to investigate and/or report the abuse and neglect" as required by California law.

26 FAC ¶ 37, 45, 54.  Thus, this case is more analogous to Alejo, which involved a complete

27 abdication of their mandatory duty to investigate, as opposed to Jaqueline T., where the

28 social workers conducted an investigation that was alleged to be inadequate.  See Ortega v.

1  Sacramento Cnty. Dept. of Health & Human Servs, 161 Cal.App.4th 713, 732 (2008)

2  (distinguishing between a "*failure* to investigate," which is "clearly a breach" of the

3  mandatory duty owed under Penal Code § 11166, and "a claim of *inadequate*

4  investigation.") (emphasis added).

5       The City Defendants separately argue that, like Jacqueline T., this is "not a situation

6  where officers performed *no* investigation."  City Defs.' Mot. to Dismiss at 14.  They point

7  out that in response to the reports of suspected child abuse, Officers Wade and Deguilo

8  went to Kayleigh's home, but observed nothing that would have caused them to know or

9  suspect that she was being abused.  Id.  *This argument strains credulity*.  Consistent with

10  the information reported to them, the officers personally observed that Kayleigh had bruises

11  on her face, "appeared gaunt, sick, malnourished, and distressed with dark circles under her

12  eyes that her neighbors had recently noticed," and had vomited in front of them.  FAC ¶ 51.

13  The officers also observed a malnourished man with sunken cheek bones and obviously

14  under the influence of drugs along with another suspicious individual known to be on

15  probation attempting to flee the premises.  Id.  Despite these obvious signs of potential

16  child abuse and neglect, the officers allegedly conducted no investigation.  Id.  Construing

17  the facts alleged in a light most favorable to Plaintiffs, the Court finds that "a reasonable

18  person in [the officers'] position would have suspected [child] abuse."  Alejo, 75

19  Cal.App.4th at 1186.

20       Finally, Defendants contend that Plaintiffs cannot show causation; to wit, that their

21  failure to comply with their mandatory reporting and investigation duties resulted in harm.

22  In rejecting this argument, the court in Alejo explained that causation is a question for the

23  finder of fact that cannot be resolved at the pleading stage.  75 Cal.App.4th at 1189 ("The

24  complaint in the case before us alleges that despite Hector's account of Alec's abuse,

25  Officer Doe performed no investigation and made no report and, as a result, Alec suffered

26  further abuse. Therefore, the necessary linkage between the mandatory duty and the injury

27  is established for pleading purposes.").  Defendants' reliance on Jacqueline T. is misplaced,

28

as the issue of causation was decided on summary judgment, not at the pleading stage.  The Court finds that Plaintiffs have stated a plausible claim for negligence/negligence per se.

**IV.**    **CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.    Defendants' respective motions to dismiss are GRANTED IN PART and DENIED IN PART.  The motions are GRANTED as to Plaintiffs' first claim under 42 U.S.C. § 1983 for violation of due process, second claim under <u>Monell</u> and third claim for violation of the Bane Act, which are dismissed with leave to amend.  The motions to dismiss are DENIED in all other respects.

2.    Plaintiffs shall file their Second Amended Complaint no later twenty-eight (28) days from the date this Order is entered into the docket.  Plaintiffs are hereby notified that any pleading filed in this Court is subject to Federal Rule of Civil Procedure 11, and as such, they may amend only to the extent that they have a good faith basis for doing so.

3.    This matter is REFERRED to Magistrate Judge Donna Ryu for a mandatory settlement conference to take place within ninety (90) days of the date this Order is filed.  The deadline for Defendants to file their response to the Second Amended Complaint shall be held in abeyance pending the settlement conference.  In the event the parties are unable to reach a settlement, Defendants shall file their responsive pleading or Rule 12(b) motion within fourteen (14) days of the conclusion of the settlement conference.

IT IS SO ORDERED.

Dated:  12/10/15

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge